IN THE UNITED STATES DISTRICT COURT
Middle District of Florida
Ft. Myers Division

2:18-CV-463-FHM-38-MRM

United States of America
*ex rel.*
Lee M. Mandel, MD, FACS,

Plaintiffs,

vs.

Michael P. Varveris, M.D.

Defendant.

_____

**FILED UNDER SEAL**

**Demand for Jury Trial**

**COMPLAINT**

S-3

# Contents

I.  Jurisdiction, Venue, and Parties ........................................................1

II. The False Claims Act and Medicare.................................................4

    A. False Claims Acts...........................................................................4

    B. Medicare.........................................................................................6

    C. Otolaryngology Overview and Routine Endoscopies.................8

III. CPT 31235 False Claims—Puncturing Patients' Facial Bones .........9

IV. Evaluation and Management False Claims ....................................15

V.  Relator Uncovered the Fraudulent Conduct. ...............................18

VI. Causes of Actions ............................................................................20

    A. Count I: Violations of 31 U.S.C. § 3729(a)(1)(A) .....................20

    B. Count II: Violations of 31 U.S.C. § 3729(a)(1)(B)....................21

## COMPLAINT

1.      *Qui tam* Plaintiff Relator Lee M. Mandel, MD, FACS, through his attorney, brings this Complaint on behalf of the United States and on his own behalf, pursuant to the Federal False Claims Act, 31 U.S.C. § 3730 *et seq.*

2.      Under the False Claims Act, a private person may sue in federal district court for himself and for the United States and may share in any recovery. 31 U.S.C. § 3730(b). That private person is a *relator*, and the action that the relator brings is called a *qui tam* action.

3.      Relator alleges that Defendant submitted, or caused to be submitted, to U.S. government health care programs false and fraudulent claims for payment.

### I.      Jurisdiction, Venue, and Parties

4.      This Court has jurisdiction under 31 U.S.C. § 3732 and 28 U.S.C. § 1345. Jurisdiction over the state law claims arises under 31 U.S.C. § 3732(b) (jurisdiction over state claims arising from the same transaction or occurrence as an action under the federal FCA), and 28 U.S.C. § 1367(a) (supplemental jurisdiction).

5.      This Court has personal jurisdiction over Defendant because Defendant transacts business and can be found in this district, and Defendant committed acts within this district that violate 31 U.S.C. § 3729. 31 U.S.C. § 3732(a).

6.    Upon information and belief, none of the jurisdictional bars in the FCA, 31 U.S.C. § 3730(e), applies to this action.

7.    Venue is proper in this district under 31 U.S.C. § 3732(a) and 28 U.S.C. §1391(b) and (c) because Defendant resides and/or transacts business in this district and has committed acts within this district that violate 31 U.S.C. § 3729. Section 3732(a) further provides for nationwide service of process.

8.    **Relator Lee M. Mandel** MD, FACS, has complied with all procedural requirements of 31 U.S.C. §3730(b)(2).

9.    Dr. Mandel has worked in private practice in the field of otolaryngology since 1996. Among his credentials:

- Board Certified by American Board of Otolaryngology - Head and Neck Surgery;
- Board Certified by American Board of Facial Plastic and Reconstructive Surgery;
- Fellow of the American Rhinologic Society, and
- Fellow of the American College of Surgeons.

10.    Dr. Mandel completed his Residency training at Mount Sinai Hospital (1990-1996) in New York City.

11.    Dr. Mandel is recognized by his peers and others for his expertise and experience in the practice of otolaryngology:

- Immediate past-President, Florida Society of Otolaryngology.
- Member, Patient Advocacy Committee, American Rhinologic Society.

2

- Chief of Otolaryngology and Facial Plastic Surgery at Weston Outpatient Surgery Center.
- Former Official Sinus and Allergy Specialist and Official Facial Reconstructive Surgeon for the Florida Panthers NHL Hockey Team.

12.     Dr. Mandel is a faculty member and planning committee member of the Open Forum, the annual international otolaryngology conference, held under the auspices of the Foundation for Innovation, Education and Research in Otolaryngology.

13.     Dr. Mandel seeks to stay abreast of professional issues and current advances in his specialty practice. He engages in educational and professional conferences that offer a forum for discussion among practitioners and continuing education. He also often communicates with rhinologists, ENTs, and otolaryngologists, who share anecdotal reports of unusual circumstances of importance to those whose practices focus on patients with disorders of the nose, sinuses, and skullbase.

14.     **Defendant Michael P. Varveris, M.D.** practices medicine in Naples, Collier County, Florida. According to his website, he is board certified in internal medicine, clinical lipidology, and "Anti-Aging, Regenerative and Functional Medicine, and authored the HAPI Heart Diet, and The HAPI Heart Diet and

3

Cookbook (2007).[1] Significantly, he is *not* certified by American Board of Otolaryngology and is not a member of the American Rhinologic Society.

## II.    The False Claims Act and Medicare

### A.    False Claims Acts

15.    The Federal False Claims Act is the federal government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States. *See* S. Rep. No. 345, 99 Cong. 2d Sess. at 2 (1986), reprinted in 1986 U.S.C.C.A.N. 5266.

16.    The Act prohibits the submission of false or fraudulent claims and false statements so as to obtain or keep federal money. It provides:

> (1) In general.— Subject to paragraph (2), any person who—
>     (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>     (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>                         * * *
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . ., plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

17.    Under the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the civil penalties were adjusted from $ 5,500

---

[1]        https://www.michaelpvarverismd.com/about-dr-v

4

to $11,000 for violations occurring on or after September 29, 1999. For violations that occurred after November 1, 2015, Department of Justice (DOJ) announced increased penalties to between $10,781 and $21,562 per fraudulent claim.[2]

18.    The terms "knowing" and "knowingly" "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

19.    "Upcoding" is an act of committing fraud by knowingly and intentionally submitting a claim under an inappropriate diagnostic or procedural code to obtain a higher rate of reimbursement. Upcoding also occurs by changing the procedure code to a code that pays more money.

20.    Upcoding can harm patients medically and financially. Fabricated medical histories in patients' charts and medical records can forever skew diagnoses and treatment. This may cause a patient to undergo additional diagnostic exams or even cause a subsequent healthcare provider to perform a procedure that might be unnecessary were the patient viewed as lower risk. In addition, a patient may be declined or charged more for long-term care or life insurance due to these false diagnoses.

---

[2]    https://www.federalregister.gov/documents/2017/02/03/2017-01306/civil-monetary-penalties-inflation-adjustment-for-2017

5

## B.   Medicare

21.     Medicare, enacted in 1965 under Title XVIII of the Social Security Act, is a third-party reimbursement program that underwrites medical expenses of the elderly and the disabled. 42 U.S.C.§§ 1395 *et seq*. Medicare reimbursements are paid from the federal Supplementary Medical Insurance Trust Fund.

22.     Medicare Part B generally covers physician services, including medical and surgical treatment and outpatient treatment and diagnosis. Part B, 42 U.S.C. §§ 1395j *et seq*.; 1395l (payment of benefits). The Medicare claims in this case arise primarily under Medicare Part B.

23.     Physicians must enroll in the Medicare program to be eligible to receive Medicare payment for covered services provided to Medicare beneficiaries. 42 C.F.R. § 424.505.

24.     CMS requires that all claims for physician services be submitted on a form CMS-1500 (Health Insurance Claim Form) ("Form 1500") or its electronic equivalent. 42 C.F.R. 424.32 (Basic requirements for all claims).

25.     At all times relevant to this action, Defendant submitted, or caused to be submitted, the electronic equivalent of Form 1500 to CMS for reimbursement for services.

26.     Form 1500 requires the submitting healthcare provider to include various fields of information prior to reimbursement, including: the date(s) of

service; a code for the service(s) provided known as a "Current Procedural Terminology Code" or "CPT Code"); and the rendering healthcare provider's national identification number ("National Provider Identifier" or "NPI") and signature.

27.     According to Form 1500's instructions, a provider's signature certifies "that services shown on [the Form 1500] were medically indicated and necessary for the health of the patient and were personally furnished by [the provider] or were furnished incident to [his/her] professional service by [his/her] employee under [his/her] immediate personal supervision."

28.     Providers, such as Defendant, submit claims to Medicare by transmitting them to a private carrier or a Medicare Administrative Contractor ("MAC"), which processes the claims on behalf of HHS/CMS.

29.     All healthcare providers that submit claims electronically to CMS or to CMS MACs, must certify in their application that they "will submit claims that are accurate, complete, and truthful," and must acknowledge that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine

7

and/or imprisonment under applicable Federal law." *See* Medicare Claims Processing

Manual, § 30.2.A.

30.     Medicare rules and policies require healthcare providers to

contemporaneously create and maintain accurate medical records to support the

providers' claims for reimbursement. *See e.g.,* CMS MLN Matters Number: SE1022

("Providers/suppliers should maintain a medical record for each Medicare

beneficiary that is their patient. Remember that medical records must be accurately

written, promptly completed, accessible, properly filed and retained.")

**C.     Otolaryngology Overview and Routine Endoscopies**

31.     Otolaryngology is a medical specialty focusing on the care and

treatment of the ear, nose, and throat. Otolaryngologists are physicians trained in the

medical and surgical management and treatment of patients with diseases and

disorders of the ear, nose, throat (ENT), and related structures of the head and neck.

They are commonly referred to as ENT physicians. Otolaryngologists whose practices

focus on patients with disorders of the nose, sinuses, and skullbase are also known as

rhinologists.

32.     Otolaryngologists commonly perform nasal endoscopy, CPT 31231, a

diagnostic procedure that allows for visual inspection of patients' sinuses.

Otolaryngologists typically perform this procedure in the office, following

application of a decongestant and/or local anesthetic, with an endoscope, a thin flexible tube inserted through a nostril and into a patient's sinuses.

33.     Routine nasal endoscopies, CPT 31231, are one of otolaryngologists' most commonly billed procedures to Medicare. This is because an otolaryngologist who treats patients with disorders of the nose or sinuses must look at a patient's detailed nasal anatomy before diagnosing and performing procedures on a patient's sinuses. The CT scan is another readily available and increasingly used diagnostic tool.

**III.     CPT 31235 False Claims—Puncturing Patients' Facial Bones**

34.     CPT 31235 is a "nasal/sinus endoscopy, *diagnostic* with sphenoid sinusoscopy [via puncture of sphenoidal face or cannulation of ostium]) complicated." Unlike CPT 3123<u>1</u>, which involves looking through a nostril, the CPT 3123<u>5</u> diagnostic requires a physician to surgically open a hole





Sinuses

Frontal sinus
Ethmoidal sinus
Sphenoidal sinus
Maxillary sinus

through the front wall of the sphenoidal sinus, then insert the endoscope through the "puncture" made for that diagnostic, and into a patient's sinus.

35.     The American Academy of Otolaryngology—Head and Neck Surgery clarifies that the CPT 31235 diagnostic procedure *requires puncturing a hole through a patient's facial bones and into the sinus at the time of the endoscopy.*

> Reimbursement: There have been a number of member inquiries on the correct usage of CPT® codes 31233 Nasal/sinus endoscopy, diagnostic with maxillary sinusoscopy (via inferior meatus or canine fossa puncture) and 31235 Nasal/sinus endoscopy, diagnostic with sphenoid sinusoscopy (via puncture of sphenoidal face or cannulation of ostium). Some who perform endoscopic exams after the postoperative global period to view the interior of maxillary or sphenoid sinuses through existing surgically created patent sinusotomies are reporting 31233 or 31235 (or, perhaps both).
>
> When the physician performs endoscopic exams postoperatively (to view the interior of maxillary or sphenoid sinuses through existing surgically created patent sinusotomies), the Academy's position is that only CPT code 31231 Nasal/sinus endoscopy, diagnostic, unilateral or bilateral (separate procedure) is appropriate. Our rationale is that *CPT* codes 31233 and *31235 require a puncture or trocar cannulation*[3] prior to placing the scope into the sinus. CPT code 31231 is bilateral while the CPT codes 31233 and 31235 are unilateral. *The use of CPT* code 31233 or *31235 to report diagnostic sinus endoscopy performed via an existing and patent opening into the maxillary or sphenoid sinus is incorrect.*

http://www.entnet.org/?q=node/679 [Emphasis supplied].

36.     Rarely is this invasive diagnostic necessary because for almost all patients there is no need to visualize the sphenoid sinus directly given that it is the

---

[3]     A cannula is "a small tube for insertion into a body cavity, duct, or vessel." https://www.merriam-webster.com/dictionary/cannula#medicalDictionary. A trocar is "a sharp-pointed surgical instrument fitted with a cannula and used especially to insert the cannula into a body cavity as a drainage outlet." https://www.merriam-webster.com/dictionary/trocar.

sinus that is most infrequently diseased; additionally, CT scanning can give all of the necessary information non-invasively. Given the availability of CT scanning, *there is virtually no need to ever puncture a sinus to look into it from a diagnostic perspective.* However, there is nothing fraudulent about performing CPT 31235 if it is medically required.

37.     Indiscriminately puncturing the sphenoid sinus without a CT scan is far below the standard of care because it is *dangerous.*

38.     The sphenoid sinus is classically accessed with a 4 mm diameter endoscope. The orbit (hole) must be larger than the endoscope, often >7 mm (.27 in).[4] Specialized equipment is necessary to widen the natural ostium (drainage hole) of the sphenoid sinus, and great care and training is required to know in exactly which direction the opening should be expanded so as to avoid damage to vital structures in and around the sphenoid sinus. *The ability to control what may be massive bleeding from the sphenopalatine artery, coursing just below the natural ostium, is absolutely necessary.*

39.     The sphenoid sinus is surrounded by vital structures including the dura (outermost membrane enveloping the brain), pituitary, optic nerve, pterygoid canal and nerve, internal carotid artery and the cavernous sinus with its associated cranial nerves (III, IV, V1, V2, and VI).

---

[4]     A pencil eraser is approximately 6 mm; a collar button approximately 7 mm.

40.    There is a 41% or more rate of protrusion of the internal carotid artery into the sphenoid sinus and a 30% or more rate of dehiscence of its bony covering. "Dehiscence" means lack of a bony covering, making the artery more susceptible to traumatic rupture by an instrument. Damaging this structure in an office setting *would be uniformly fatal.*

41.    The optic nerve is on the same side as the carotid artery. Optic nerve damage causes blindness. The pituitary gland is on the other side of the sphenoid sinus, damaging it could cause massive bleeding, cerebrospinal fluid leak and/or loss of function of the pituitary gland. And the brain (dura) sits on the roof of the sinus.

42.    In short, *the sphenoid sinus is the most dangerous of all of the paranasal sinuses to access and one that most otolaryngologists, who are specifically trained to access this area, are loath to instrument.*

43.    Direct visualization of the sphenoid sinus is dangerous as a diagnostic tool, as sphenoid pathology, if symptoms indicate, may safely be diagnosed using CT imaging and nasal endoscopy (viewing the outside of the natural ostium to determine whether pus, polyps, etc. are emanating from the natural ostium), without instrumenting and entering the sinus.[5]

44.    In addition, the area that would need to be traversed to gain access to the sphenoid sinus ostium (natural opening) is extremely narrow. It would be very

---

[5]    "A high index of clinical suspicion, routine office nasal endoscopy and radiological imaging are central to making an accurate and timely diagnosis of isolated sphenoid sinus pathology." https://www.ncbi.nlm.nih.gov/pubmed/18242904/    [emphasis supplied]

painful to try and access this area in a practice setting, let alone then passing an endoscope through the ostium into the sinus, considering the normal size of the sinus ostium is half the size of the endoscope usually used in these circumstances.

45.     Dr. Varveris is an internist. He lacks the otolaryngology training and experience to grasp the complex anatomy and physiology of the nose and sinuses. Without such training, he could not determine that this complicated and potentially dangerous procedure is medically reasonable or necessary.

46.     Notwithstanding Defendant's lack of training, and notwithstanding the risks associated with this invasive and dangerous diagnostic, in 2014, 2015 and 2016 Defendant's CPT 31235 reimbursements ranked him the second highest biller *nationwide* for this procedure.

47.     Otolaryngologists have specific indications to diagnose sinus problems. It is unheard of for such a volume of such an invasive diagnostic to have normal results. When so many diagnostics turn out normal/negative, that leads to the inexorable conclusion that the vast majority of the CPT 31235s were medically unnecessary in the first place. However, in contrast to Defendant's claimed volume of CPT 31235—second highest in the U.S.— Defendant file no routine diagnostics under code CPT 31231. Indeed, *Defendant files no other Medicare claims relating to his patients' sinuses.*

13

48.     Further, it appears Defendant files not just one, but often files a second claim for CPT 31235 on the same patient. This requires a distinct puncture. If a prior procedure left an opening, then visualization of the maxillary sinus through the pre-existing puncture is billed using CPT 31231 (not 31235).

49.     With respect to the medical necessity for CPT 31235 and customary rhinological practices in Florida, Relator concluded, based on his experience and knowledge:

- There is no rhinological subspecialty limited to the sphenoidal sinuses.
- It is medically unreasonable, and below the standards of professional conduct, for an otolaryngologist to limit diagnoses to the sphenoid sinuses.
- There is no "cluster" of symptoms or diagnoses that would make this volume of CPT 31235 procedures medically reasonable or necessary in Florida.
- It is medically reasonable and appropriate for an otolaryngologist to routinely diagnose sinus conditions through a nostril, or with a CT scan, rather than by puncturing a patient's facial bones and inserting an endoscope through the puncture.
- It is *medically unreasonable and inappropriate* to routinely and invasively puncture a patient's facial bones for a routine diagnostic, especially without first obtaining a CT scan, which is readily available and noninvasive.

50.     For all the reasons above, it is even more *medically unreasonable and inappropriate* to routinely and invasively puncture a patient's facial bones *a second time* for a routine diagnostic.

14

51.   Based on Relator's experience and expertise in rhinology and otolaryngology, Relator has determined that most or all of Defendant's CPT 31235 claims are false.

52.   Although there are circumstances under which CPT 31235 may be medically necessary, Relator's investigation has determined that Defendant's reputation in the professional community of rhinologicists would not have brought about referrals of patients requiring this more invasive, more complex, CPT 31235 procedure. This is because Defendant *is not a rhinologist, not an ENT, and not an otolaryngologist*. Such a referral would be negligence.

53.   If Defendant actually performed these invasive diagnostic endoscopy procedures, then he unnecessarily punctured patients' facial bones.

## IV.   Evaluation and Management False Claims

54.   Medicare pays for physicians' and for specific non-physician practitioners' medically necessary evaluation and management (E/M) services.[6] Medicare Claims Processing Manual, Publication 100-04, Ch.12, §30.6.1.

55.   It is not medically necessary to perform and then bill for a higher level of evaluation and management service when professional knowledge and experience dictates a lower level of service. Manual at Ch. § 30.6.1.A.

---

[6]   Non-physician practitioners must comply with physician collaboration and supervision rules, and all billing rules. The service must be within the scope of practice for a non-physician practitioner in the State in which he/she practices. Medicare Claims Processing Manual, Ch. 12, § 30.6.1.A.

Medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code. *It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted.* The volume of documentation should not be the primary influence upon which a specific level of service is billed. Documentation should support the level of service reported. The service should be documented during, or as soon as practicable after it is provided in order to maintain an accurate medical record.

Manual at Ch. § 30.6.1.A. [emphasis supplied]

56.     In 2014, 2015, and 2016 *all* of Defendant's evaluation and management claims for *new* patient office or other outpatient visits were code 99205.

57.     For all three years, Defendant filed no claims for new patients' lower level of evaluation and management claims 99202, 99203, and 99204.

58.     In Dr. Mandel's opinion, because Dr. Varveris files no claims for procedures that actually address and treat patients' problems, it is highly suspect that it would be medically necessary or appropriate to claim 99205 for all new patients.

59.     It appears Defendant also also upcoded *established* patients' evaluation and management claims to 99214.

Year   % = 99214
2014:  92% of claims = 99214
2015:  65% of claims = 99214
2016:  57% of claims = 99214

60.     CPT code 99214 necessarily involves a presenting problem of "moderate to high severity" and is described as having typical face-to-face time with the patient of 25 minutes. The code requires a *comprehensive history*.

16

> The comprehensive history must include a review of all the systems
> and a complete past (medical and surgical) family and social history
> obtained at that visit. In the case of an established patient, it is
> acceptable for a physician to review the existing record and update it to
> reflect only changes in the patient's medical, family, and social history
> from the last encounter, but the physician must review the entire history
> for it to be considered a comprehensive history.

Medicare Manual at Ch. § 30.6.1.D

61.     Defendant performs no procedures typical of patients with problems of moderate to high severity. In Relator's experience, at least some patients who present with problems of *moderate to high severity* require corresponding medical or surgical procedures. But Defendant conducts only diagnostic procedures, the invasive CPT 31235 diagnostic, discussed above, and:

·   CPT 36415, collection of venous blood by venipuncture.
·   CPT 93880 Ultrasound scanning of blood flow (outside the brain) on both sides of head and neck.

62.     Defendant files no claims for procedures that actually address and treat patients' problems (in contrast to diagnostic procedures). He files no claims for the types of procedures that would be anticipated for patients who present problems of moderate to high severity. When all of these E/Ms turn out normal/negative, that leads to the near certainty that many were upcoded.

63.     Further, and more significantly, although Defendant claims "moderate to high severity" CPT 99214 repeatedly for the same patients, these patients receive no other treatments from Dr. Varveris, and based on 2015 CMS shared patient files,

17

his patients receive no treatments from other physicians in the 30 days after they see him.

64.    Varveris's 99214s per patient are higher than the mean (1.66 per patient) and median (1.4 per patient).

| Code,description | srvc cnt | bene unique cnt | avg. svc / pt |
|---|---|---|---|
| *Year 2014: 92% of claims = 99214* | | | |
| 99213, 10 min. | 66 | 24 | 2.8 |
| 99214, 25 min. | 771 | 91 | **8.5** |
| | | | |
| *Year 2015:  65% of claims = 99214* | | | |
| 99212, 10 min. | 38 | 28 | 1.4 |
| 99213, 15 min. | 335 | 84 | 4.0 |
| 99214, 25 min. | 689 | 94 | **7.3** |
| | | | |
| *Year 2016: 57% of claims = 99214* | | | |
| 99212, 10 min. | 159 | 48 | 3.3 |
| 99213, 15 min. | 348 | 74 | 4.7 |
| 99214, 25 min. | 671 | 90 | **7.5** |

## V.    Relator Uncovered the Fraudulent Conduct.

65.    The allegations or transactions herein were not publicly disclosed. Relator is an original source of the information on which his allegations are based. To the extent there were any qualifying public disclosures, Relator's allegations materially add to any information contained in any such public disclosures.

66.    The Centers for Medicare and Medicaid Services (CMS) disclose hundreds of databases. Some are available online and others may be ordered from CMS. https://data.cms.gov/

67.     CMS disclosed claim data through the "Medicare Provider Utilization and Payment Data: Physician and Other Supplier Public Use File." This data is based on information from CMS's National Claims History Standard Analytic Files. It contains 100% final-action physician/supplier Part B non-institutional line items for the Medicare fee-for-service population.[7]

68.     Each year's PUF database contains more than 242 million entries relating to a single year's Medicare part B claims. However, this raw data does not reveal the alleged frauds. In particular:

    i.    It does not disclose total amounts billed by or paid to any of the more than 900,000 providers.

    ii.    It does not compare providers by amounts billed, amounts paid, procedures performed, or otherwise.

    iii.    It does not disclose medical relationships between procedures.

    iv.    It does not reveal procedures *not* performed that should have been performed.

69.     Then, using these figures—which were not disclosed by CMS— and based on statistical analysis of millions of records—he applied his medical knowledge, skills, and experience to the data.

70.     Relator supported his medical conclusions with the three years of 9+ million records per year part B data, and the 55+ million records from the shared

---

[7]     http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier.html as of October 10, 2014.

19

patient data set.[8] Because there is nothing inherently fraudulent with performing CPT 31235, data resulting from this analysis and synthesis support these allegations but, by itself, this data did not "disclose" the allegations herein.

71.     Relator's experience, expertise, and knowledge of rhinological practices in Florida and throughout the United States, and the relationship between the particular medical procedures and diagnostics discussed herein allows him to make strong inferences and conclusions resulting in the allegations in this Complaint.

## VI.     Causes of Actions

72.     This is a claim for refunds, treble damages, civil penalties and attorney's fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*.

### A.     Count I: Violations of 31 U.S.C. § 3729(a)(1)(A)

Plaintiff repeats and realleges the paragraphs 1- 71 above as if fully set forth herein.

73.     Defendant knowingly presented or caused to be presented false or fraudulent claims for payment or approval to Government Health Care Programs, all in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

74.     The United States paid said claims and has sustained damages because of these acts by the Defendant.

---

[8]     Relator has not included voluminous information as an exhibit. One year's 9 million record part B file would require 27 million pages. If printed, 5,400 standard cartons. Stacked four high, and lined end to end, the cartons would stretch 6 1/2 football fields (1,969 feet).

20

### B.    Count II: Violations of 31 U.S.C. § 3729(a)(1)(B)

Plaintiff repeats and realleges paragraphs 1- 71 above as if fully set forth herein.

75.    Defendant knowingly made, used or caused to be made, or used false records or statements material to a false or fraudulent claim, all in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

76.    The United States paid said claims and has sustained damages because of these acts by the Defendant.

### *PRAYER*

WHEREFORE, *Qui Tam* Plaintiff Relator Mandel, for the United States, the State of California, and for himself, prays that judgment be entered against Defendant as follows:

A.    For each count, the amount of damages, trebled as required by law, and civil penalties up to the maximum permitted by law,

B.    For the maximum *qui tam* percentage share allowed by law and for attorney's fees, costs and reasonable expenses; and

C.    For any and all other relief to which Plaintiff may be entitled.

21

Plaintiff requests trial by jury.

*/s/ Jonathan Kroner*
Fla. Bar 328677
Jonathan Kroner Law Office
300 S. Biscayne Blvd., Suite 3710
Miami, Florida 33131
305 310 6046
jk@FloridaFalseClaim.com
Attorney for *Qui Tam* Plaintiff

This Complaint will **not** be served on Defendant until ordered by the Court.

I HEREBY CERTIFY that the foregoing Complaint has been mailed, postage prepaid, certified mail, this 27 day of July, 2018, to:

- Jeff Sessions, Attorney General, United States Department of Justice, c/o Sealed Document Civil Process Clerk 950 Pennsylvania Ave, N.W., Washington, DC 20530-001.
- Maria Chapa Lopez, U.S. Attorney, c/o Sealed Document Civil Clerk, U.S. Attorney's Office, 400 North Tampa St., Suite 3200, Tampa, Fl. 33602

Email only to Randy Harwell, Chief, Civil Division, Randy.Harwell@usdoj.gov

22